Filed 10/24/25  P. v. James CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>MARQUIS WAYNE JAMES,<br><br>        Defendant and Appellant. | B338472<br><br>Los Angeles County<br>Super. Ct. Nos.<br>POMKA098987,<br>XEAKA099220-01 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Sentence vacated; remanded with instructions.

Brad J. Poore, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Deepti Vaadyala, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Marquis Wayne James appeals from the sentence the trial court imposed after the California Department of Corrections and Rehabilitation notified the court that James was entitled to resentencing under Penal Code section 1172.75.[1] James contends the court did not comply with the requirements of section 1385, subdivision (c), as amended. We agree. Accordingly, we vacate the sentence and remand the matter for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

**1.** ***The robberies and attempted robbery of 11 victims***[2]

At about 4:00 a.m. on August 6, 2012, Lindsey Montgomery arrived at the McDonald's where she worked. James and a second man[3]—who were wearing baseball caps and "rag[s]" over their faces—told Montgomery to open the store, take them to the safe, and open it. When Montgomery, nervous, had difficulty opening one of the safes, one of the men—who had a handgun—held it to her head and told her she had 10 seconds to open the safe or he would kill her. Montgomery was able to open both safes and the men took money, put it in a bag, and left. (*James I.*)

---

[1]    References to statutes are to the Penal Code.

[2]    We take our statement of facts—as do the parties—from the opinion on direct appeal in this case, *People v. James* (Oct. 1, 2014, B254611) [nonpub. opn.] (*James I*).

[3]    James later admitted being one of the two men who robbed the McDonalds. (*James I.*) The second man later was identified as Jimmy Duwan Brown. Brown was charged with the robberies as well. In a 2023 letter to the court in connection with this resentencing proceeding, James said Brown is his younger brother.

About two weeks later, on August 20, Adriana Garay was working as a cashier at the Juan Pollo restaurant. Two men wearing black hats and bandanas came into the restaurant. One of them put a gun to Garay's back and walked her to the cash register. Garay opened the register. While one of the men took the money out of the drawer, Garay saw the other man holding two of her coworkers—Gabriela Salvador and Adullman Vasquez—at gunpoint. Both Salvador and Vasquez were on their knees. One of the men kicked Salvador, who was seven months pregnant, on her left side. Then the men left. (*James I*.)

Four days later, on August 24, 2012, Nicholas Pro and his girlfriend Brittney Chavez were having dinner at the Las Margaritas restaurant with Pro's grandparents, Helen and Fernando Canedo. Three men—their faces covered with bandanas—came into the restaurant. One man had a rifle. He told Pro and the others at the table to empty their pockets. Pro put his wallet and car keys on the table. Pro's grandfather took the money from his pocket and put it on the table. Pro's grandmother put her purse on the table. The man with the rifle took Pro's cell phone, his grandfather's money, and the cash from his grandmother's purse. Then he left. (*James I*.)

In the meantime, Pedro Sandro was working in the kitchen at Las Margaritas. Someone hit him on the back of the head. He turned around and saw a man wearing a hat, a rag covering his face. The man put a gun against Sandro's head and told him—and Seveno Morales, who worked as a dishwasher—to lie down on the floor face down. Once Morales was lying on the floor, the man with the gun kicked him on his left side, then took his money from his pocket along with the keys to the restaurant. (*James I*.)

The man with the gun then approached Sandro, who gave the man his wallet. The man made Sandro get up and open the cash register at the take-out window. The man took money from the drawer, then told Sandro to lie back down with his hands behind his head. (*James I.*)

Waitress Maribel Serrano was working at the cash register in Las Margaritas. Two men, their faces covered with handkerchiefs, approached her. One walked around behind her and the other one stood in front of her, aimed a gun at her, and told her to open the register. The man reached into the drawer and took the money. One of the men then went into the kitchen. The man with the gun grabbed Serrano by her clothing and took her to the warehouse, even though she told him she didn't know where the safe was. The man took her wallet from her apron. It contained her cash, driver's license, and bank card. Eventually all three men left the restaurant. (*James I.*)

A detective investigating the robberies watched the videotapes from the restaurants. He "received information" that James had been involved in all of the robberies. James's girlfriend told police that James and his cohorts had planned the robberies about a week earlier and they'd taken about $25,000. When the detective "contacted" James on August 29, he was wearing a baseball cap just like the one in the videotapes of the robbers taken at each of the restaurants. In a call from jail to his girlfriend, James said he'd been "dumb for wearing the [same] hat [to] all three robberies." (*James I.*)

2.    *The charges, change of plea, and sentence*

The People charged James with 10 counts of robbery (naming as victims Montgomery in the McDonalds robbery, three victims in the Juan Pollo robbery, and six victims in the

4

Las Margaritas robbery).  The People also charged James with one count of attempted robbery (on victim Chavez at Las Margaritas).  The People alleged James personally used a firearm in the crimes within the meaning of section 12022.53, subdivision (b), and that a principal was armed with a firearm in the crimes within the meaning of section 12022, subdivision (a)(1).  In addition, the People alleged James had committed the offenses after having been released on bail[4] and that he'd served three prior prison terms under section 667.5, subdivision (b).  (*James I*.)

The case was set to start trial on August 28, 2013.  The prosecution had offered 30 years.  Defense counsel and the court calculated James's potential exposure as about 75 years in prison.  James did not want to accept the People's offer and decided to plead "open" to the court.  Accordingly, after being advised of his rights, James pleaded no contest to all 11 counts and admitted the firearm, out-on-bail, and prison prior allegations.  (*James I*.)

On December 10, 2013, after receiving sentencing memoranda from both the prosecution and defense counsel, the court sentenced James to 40 years and four months in the state prison on the two cases.  In the robbery case, the court chose count 2 as the principal count.  The court imposed the midterm of three years for the robbery, plus 10 years for the personal use of a firearm, two years for the out-on-bail enhancement, and three one-year terms for the three prison

---

[4]     James had been arrested on August 7, 2012, for being a felon in possession of a firearm and ammunition.  He had pleaded to that charge—"open" to the court—released on bail, and ordered to return in September for sentencing.  (*James I*.)

priors. On counts 4, 6, 8, and 9, the court imposed the midterm of three years, plus ten years for the gun enhancement, to be served concurrently with count 2. On counts 1, 3, 5, 7, and 10, the court imposed one-third the midterm of three years (thus one year) plus one-third the 10-year term for the gun (three years and four months), each to be served consecutively. On count 11 for attempted robbery, the court imposed the midterm of two years plus 10 years for the gun, to be served concurrently. In the case involving charges of being a felon in possession of a gun and ammunition, the court imposed one-third the midterm of two years (thus eight months), to be served consecutively to the other counts. (*James I.*)

Notwithstanding his open plea to the court, James sought a certificate of probable cause. The court denied the request. James appealed nonetheless. His court-appointed appellate counsel filed a brief under *People v. Wende* (1979) 25 Cal.3d 436. Another panel of this court affirmed James's conviction. (*James I.*)

### 3. *The CDCR referral and proceedings on resentencing*

In June 2023, James's name apparently appeared on a "list of those eligible for possible re-sentencing" under Senate Bill No. 483 that the California Department of Corrections and Rehabilitation sent to the trial court.[5] The court appointed counsel for James. On September 6, 2023, James's counsel filed a petition for resentencing. Counsel attached a number of certificates James had received for attending certain classes, positive "chronos," his written requests to be enrolled in various courses, and a work supervisor's report. On December 26, 2023,

---

[5] The record on appeal does not include the list.

the prosecutor filed an opposition, attaching (among other exhibits) the probation report and a list of six rules violations James had committed while in state prison.

On May 29, 2024, the trial court held a hearing. The court stated it had "reviewed its original sentencing notes" and it was "somewhat familiar with the underlying factual basis of Mr. James's plea." The court also said it had received a " 'packet of mitigating evidence' including Mr. James's performance while being incarcerated, which is exemplary, as well as a personal letter that Mr. James ha[d] submitted to the court showing not only remorse but also redemption in terms of understanding the errors of his ways in his youth and a willingness to take responsibility for his conduct, which I find very persuasive." In response to the prosecutor's question, the court stated it had not "reviewed" the prosecution's opposition brief but—the court continued—it was "not going to ignore the People's position, most certainly."

The court stated it was "willing to reduce Mr. James's sentence beyond just simply striking the state prison prior enhancements," but it "also [could not] ignore the serious nature of the underlying crimes for which he still stands convicted the multiple robberies that took place, multiple victims." The court noted it had "r[u]n many counts concurrent" in the original sentence. The court then said it would strike the prison priors, "But in terms of reducing sentence beyond that, the only thing I'm willing to do for Mr. James in terms of to his benefit is reduce his sentence by an additional year by imposing the low term on the base term rather than what was previously imposed as midterm, but the gun use enhancements will remain intact

as originally imposed."  The court then resentenced James to a total sentence in the two cases of 36 years and four months.

**DISCUSSION**

**1.** *Section 1385, subdivision (c)*

Section 1385, subdivision (c) (section 1385(c)), as added by Senate Bill No. 81 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1), provides, "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if the dismissal of that enhancement is prohibited by any initiative statute."  (§ 1385, subd. (c)(1).)  The statute continues, "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present.  Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."  (§ 1385, subd. (c)(2).)  The statute then lists nine "mitigating circumstances."  Two of them are (1) "Multiple enhancements are alleged in a single case.  In this instance, all enhancements beyond a single enhancement shall be dismissed."; and (2) "The application of an enhancement could result in a sentence of over 20 years.  In this instance, the enhancement shall be dismissed."  (§ 1385, subd. (c)(2)(B), (C).)

In *People v. Walker* (2024) 16 Cal.5th 1024, 1029, our Supreme Court held the "plain language" of section 1385(c) "contemplates that a trial court will exercise its sentencing discretion in a manner consistent with" that of the Sixth District

8

Court of Appeal in *People v. Ortiz* (2023) 87 Cal.App.5th 1087. "Specifically," the high court continued, "absent a finding that dismissal would endanger public safety, a court retains the discretion to impose or dismiss enhancements provided that it assigns significant value to the enumerated mitigating circumstances when they are present." (*Walker*, at p. 1029.) The court explained, "In other words, if the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of the enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*Ibid.*, quoting *Ortiz*, at p. 1098.) The court "emphasize[d] that . . . there must be substantial, relevant, and credible evidence of aggravating factors to neutralize the 'great weight' of the mitigating circumstances." (*Walker*, at p. 1036.)

2.    ***The record on appeal does not reflect whether the court made any finding regarding danger to public safety or, if not, complied with the "great weight" mandate of section 1385(c)***

There was no discussion at the resentencing hearing in this case of whether dismissal of one or more of the firearm enhancements would endanger public safety. Defense counsel mentioned the mitigating factors listed in Section 1385, subsection (c)(2)(A)-(I) in her petition for resentencing but she did not argue at the hearing that dismissal of the firearm enhancements would not endanger public safety. The prosecutor never mentioned public safety, either in his opposition brief or

9

in his oral argument at the hearing.  Both the court and the prosecutor seemed focused on the facts of the underlying crimes.

To be sure, the facts in a multiple victim, multiple gun use case like this one may bear significantly on the public safety question.  (See, e.g., *People v. Mendoza* (2023) 88 Cal.App.5th 287, 293 [in assessing danger to public safety if firearm enhancement were dismissed, court properly considered facts of the case, including that defendant fired gun inside the victims' residence and repeatedly pointed the gun at victim's chest]; *People v. Garcia* (2024) 101 Cal.App.5th 848, 857 [in assessing danger to public safety, court was permitted to consider " 'certain factors not related to postconviction,' " including fact defendant fired a gun during the robbery]; cf. *People v. Graham* (2024) 102 Cal.App.5th 787, 791–794 [in assessing "unreasonable risk of danger to public safety" for mental health diversion, court properly considered facts in trial transcript that defendant brought victim to motel where her codefendant held a box cutter to victim's throat, then defendant drove victim's car with victim in backseat, his hands bound with tape].)

And, had the trial court found dismissal of the enhancements would endanger public safety, it would not have been required to engage in the "great weight" analysis, or to make findings as to whether there was substantial, credible evidence of countervailing factors to neutralize the mitigating circumstances.  But, here, there was no discussion of any risk to public safety.  Nor did the court weigh the mitigating factors— two of which defense counsel had specifically cited—against any countervailing aggravating factors.[6]  Accordingly, we must return

---

[6]     The sole aggravating factor the prosecutor identified in his opposition brief was James's rap sheet, which showed sustained

10

the case to the trial court for further proceedings in accordance with the requirements of section 1385(c).

## DISPOSITION

Marquis Wayne James's sentence is vacated and we remand the matter to the trial court for further proceedings consistent with this opinion.  We do not suggest in any way how the court should rule.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



EDMON, P. J.



ADAMS, J.

---

juvenile petitions and adult convictions for theft, burglary, receiving stolen property, possession of a controlled substance, and trespass.